[Sac. No. 4840. In Bank.—March 3, 1934.]

ROLLAND A. VANDEGRIFT, Petitioner, v. RAY L. RILEY, Respondent.

Webb Shadle for Petitioner.

U. S. Webb, Attorney-General, Robert W. Harrison, Chief Deputy Attorney-General, Jess Hession and W. R. Augustine, Deputies Attorney-General, for Respondent.

SHENK, J.—The petitioner, as state director of finance, seeks a writ of mandate to compel the respondent state controller to audit and approve six demands transferring certain amounts from the emergency fund to the funds of the departments in whose favor the demands are drawn. The demands may be briefly referred to as follows:

(1) For salary and expenses of chief of division of service and supply, for the eighty-fifth fiscal year, $6,500.

(2) For the support of the bureau of commerce, $2,415.

(3) For additional expenses of conference of governors, $3,000.

(4) For the division of narcotic enforcement, $36,570.

(5) For division of social welfare, $38,000.

(6) For department of public works, division of water resources, $12,500.

As to the first two items no specific appropriations were made by the legislature in 1933. As to the remaining four items appropriations for the several departments or purposes were made in 1933, but were found by the director of

finance to be insufficient. Each item of transfer from the emergency fund was accompanied by an executive order of the department of finance, by the director of finance as its executive officer. Each order recited that a contingency had arisen in the administration of the particular department or purpose and that the transfer was "imperative for the protection of the public welfare".

The primary consideration is a determination of the power of the department of finance in the premises. This consideration involves in a general way the legislative history of the emergency fund as employed in the fiscal arrangements of the state and the application of that fund in connection with the budget plan of the expenditures of the state.

An emergency fund was first established in the general appropriation act of 1911 (Stats. 1911, p. 1370), wherein it was provided: "For emergency fund to be expended only upon unanimous vote of the board of control, approved by the controller, seventy-five thousand dollars." An identical appropriation was included in the general appropriation act of 1913. (Stats. 1913, p. 1334.) In 1915 the amount appropriated for this purpose was $100,000. (Stats. 1915, p. 627.) In 1917, $1,000,000. (Stats. 1917, p. 507.) In 1919, $250,000. (Stats. 1919, p. 1329.) In 1921, $400,000. (Stats. 1921, p. 1717.) In 1923, $700,000. (Stats. 1923, p. 257.) In 1925, $1,000,000. (Stats. 1925, p. 59.) In 1927, $1,000,000. (Stats. 1927, p. 277.) In 1929, $1,500,000. (Stats. 1929, p. 96.) In 1931, $1,500,000. (Stats. 1931, p. 318.) The 1933 appropriation for emergency fund will be specially noted later on.

Every general appropriation act prior to 1923 was entitled: "An act making appropriations for the support of the government of the state of California" for the particular biennial period. In November, 1922, section 34 of article IV of the Constitution was amended to provide for a state budget and a budget bill. Thereafter and commencing in 1923 the title of the general appropriation act has been entitled: "An act making appropriations for the support of the government of the state of California and for several public purposes in accordance with the provisions of section thirty-four of article four of the Constitution." The title of these general appropriation measures

will become significant in connection with certain contentions of the respondent to be hereinafter noted. Prior to 1923 every general appropriation act, in section 4 thereof, provided that "not more than one twenty-fourth of the amount appropriated under the act for each department or institution for the two years . . . shall be expended during any one month without the consent of the state board of control, and not more than one half of such appropriation shall be expended during [each] fiscal year, unless the same has been expressly authorized by this act". In 1923 said section 4 was worded so as to insert after the words "department or institution" the words "for support and salaries", and the language of the 1923 statute was contained in the act of 1925. In 1927 the words "for support" were used and the words "for salaries" were eliminated. In 1929 and 1931 the section carried the same language as in 1927, except that the prohibition against the expenditure of not more than one twenty-fourth of the appropriation in any one month was eliminated.

Prior to 1921 the prohibitions contained in section 4 of each act were applicable to each item of appropriation, including the emergency fund. In the act of 1921 and in each subsequent act the expenditures from the emergency fund have been expressly exempted from the provisions of section 4.

The 1933 appropriation for the emergency fund is as follows: "Item 201—For emergency fund, five hundred thousand dollars — $500,000—(exempt from section 4 of this act) to be expended only on written authorization of the state department of finance for emergencies. Emergencies within the meaning of this provision are hereby defined as contingencies for which no appropriation, or insufficient appropriation, has been made by law.

"Item 202—For special emergency fund, two hundred fifty thousand dollars—$250,000—(exempt from section 4 of this act) to be expended only on written authorization of the state department of finance for augmentation of appropriations for support of the state prisons, state hospitals, and other state institutions, when and if commodity prices increase during the eighty-fifth and eighty-sixth fiscal years." (Stats. 1933, p. 814.) Section 4 of the act of 1933 provides: "The appropriations under this act shall,

unless otherwise provided, be subject to the provisions of section 677a of the Political Code . . . ''

By the budget amendment to the Constitution in 1922 (Const., sec. 34, art. IV), the Governor was required, within the first thirty days of each session of the legislature to submit to the legislature a budget containing a complete plan and itemized statement of all proposed expenditures of the state provided by law or recommended by him, and of all its institutions, departments, boards, bureaus, commissions, officers, employees and other agencies, and of all estimated revenues for the ensuing biennial period, and to submit with the budget a budget bill covering the proposed expenditures. Obviously the preparation of a budget so required involved great detail, as well as a high degree of judgment and discretion. Prior to 1929 the Governor was assisted, in the preparation of the budget, by the department of finance, then under the management of the state board of control. In 1927 article XVIII of part III, title I, chapter III (sections 654–691) of the Political Code was redrafted. It was therein provided (sec. 654), that the department of finance ''shall have general powers of supervision over all matters concerning the financial and business policies of the state''. In section 655 it was provided that ''the department shall be under the control of an executive officer to be known as the director of finance, which office is hereby created''. Since that time the department of finance and the director thereof have assisted in the preparation of the budget.

By the foregoing legislation, enacted prior to 1933, the director of finance has been given broad powers of supervision over state expenditures and by such legislation has become an important factor in preparing the budget and in enforcing the budget provisions of the Constitution and statutes. In fact his department is an integral and essential part of the budget machinery of the state. The preparation of the budget by the Governor with the assistance of the department of finance, forms the foundation of the appropriation bill thereafter to be considered by the legislature and to be enacted. In the preparation and enactment of such a budget and budget bill absolute precision in the amount which many departments of the state will require during the ensuing biennial period is an impossibility

and cannot be expected. In many instances it is only an estimate. The inclusion of a substantial sum in each appropriation bill enacted in the last twenty-five years and specially designated "for emergency fund" was undoubtedly with the idea in mind that it would in all probability eventuate that an appropriation for a particular department or purpose would be insufficient, or that a necessary public purpose for which no appropriation had been made would have to be provided for prior to the enactment of the next budget bill. To provide for such event the emergency fund has been established in each succeeding appropriation bill, to be allocated and expended with the approval of the executive officers and fiscal agents of the state, first in 1911 with the approval of the state board of examiners, then with the approval of the state board of control and now by the department of finance, through its executive officer, the director of finance, who is the successor in authority as to such matters of the state board of control.

Between 1909 and 1933, emergency funds in the aggregate amount of $7,100,000 were included in the regular appropriation bills and were allocated to the several departments of the state government or for necessary state purposes by and under the authority of the fiscal agents of the state, in many instances to supplement the appropriations regularly made to said departments or purposes and in some instances for state purposes where no appropriations had been made. When allowances have been made from the emergency fund to supplement the appropriation made by the appropriation bill to a state department for maintenance and support, which appropriation was found by the fiscal agencies of the state to be insufficient, such allowance from the emergency fund has been expended by such departments the same to all intents and purposes as if the supplemental allowance had been made a part of the regular appropriation for said departments. The establishment and distribution of an emergency fund under this plan and procedure was no doubt in recognition of the fact that without such a method of balancing the funds required for the several departments of the state and for other state agencies and purposes, the appropriations under the old plan were inflexible and the new plan was intended, at least in part, to avoid the enactment of separate and independent contingent expense bills and appropriations found necessary under the

old system. The emergency funds thus established have been allocated and disbursed during the last twenty-five years on the authority and order of the fiscal agents of the state government without let or hindrance on the part of the courts, and, so far as we are advised, without question, until a controversy arose between the then director of finance and the then and present state controller as to whether premiums on insurance policies to indemnify the state against liability for damages arising out of the negligence of officers, agents, and employees of the state and other public agencies in the operation of motor vehicles could be paid from the emergency fund. It appeared in that case that section 1714½ of the Civil Code, establishing such liability on the part of the state and the other enumerated public agencies, had been enacted by the legislature after the final adoption of the general appropriation bill in 1929, and no appropriation had been made therein for that purpose. No fund was therefore available out of which to pay premiums on indemnity insurance policies. The director of finance ordered the policies and directed that the premiums therefor be paid from the emergency fund. The controller refused to approve the claim on the ground that no appropriation had been made in the general appropriation bill for that purpose, and that the emergency fund carried in the general budget bill could not be drawn upon for such payment. In passing upon the contention this court quoted the language of the 1929 item of the general appropriation measure "for emergency fund", which item is in the same language (except as to the amount), as the item in the appropriation for emergency fund in the 1933 statute, and through the chief justice stated:

"It has been the practice in this state for many years for the legislature to include a similar provision in the general appropriation act, thus providing for the payment of emergency claims against the state and its activities, rather than subject the departments of the state and its officers to embarrassment in the administration of the state's business, and put claimants to the annoyance and uncertainty of having to depend upon subsequent legislatures for reimbursement for services and supplies furnished. The purpose and policy of such an appropriation in the general budget bill has gone unquestioned during the time many legislatures have met. The plan seems meritorious and, so

far as we are given to understand, it has not been challenged heretofore in its general application. We see no good reason, therefore, for now saying that it is not a proper plan to pursue, provided, of course, the demands against the emergency fund are just and reasonable. The definition in the act of what circumstances shall be sufficient to give rise to an 'emergency', subjecting the emergency fund to a valid demand, seems to us to be logical and reasonable. We see no reason why it may not be held that the present situation presents an 'emergency' within the intent and definition of the legislature. . . . In the instant case the legislature has set aside a definite sum, to-wit, one million dollars, for the payment, among other things, of 'contingencies for which no appropriation has been made'. We think the use of the word 'contingencies' is sufficiently general to include a situation like the one here presented. As to the wisdom of such a course—a question suggested by the respondent—of reposing such a power in the hands of an executive officer of the state, that is a matter resting solely with the legislature." (*Heron* v. *Riley,* 209 Cal. 507 [289 Pac. 160].)

Prior to 1927 the state board of control, under section 680 of the Political Code, had power with the consent of the Governor, to authorize the creation of deficiencies in any appropriation made by law in cases of necessity; and to authorize the payment of such deficiencies out of any other money which might be legally appropriated in aid of the proper functioning of the department in whose behalf the deficiency was declared. In a controversy between the board of fish and game commissioners and the state controller, wherein the board of control acting under said section 680 had authorized the creation of a deficiency in behalf of said board, and had ordered for its support and maintenance substantial sums in excess of the amount appropriated to it in the regular appropriation act for the current year, this court held that the purpose of said section 680 was to empower the board of control with the Governor's consent to render legal the expenditure of money by boards and officers of the state for their proper functioning and in excess of the specific amount provided by the legislature in the regular appropriation measure when the budget allowance was exhausted and the necessity for such further expenditure appeared. It was also held that it was within the

power of the legislature to confer authority on the board of control thus to transfer moneys from one fund to another in order that the several departments and officers of the state might properly function. (*Board of Fish and Game Commissioners* v. *Riley*, 194 Cal. 37 [227 Pac. 775].) Section 680 of the Political Code was repealed in 1927, but was continued in effect by its re-enactment the same year as section 661 of the Political Code, except that the powers vested in the board of control under the repealed section were vested in the director of finance by the re-enactment. The authority granted in that section is analogous to the power vested in the director of finance by item 201 of the budget enactment of 1933.

That the amount set aside ''for emergency fund'' during the successive sessions of the legislature is an appropriation within the contemplation of the budget amendment to the constitution and statutes enacted pursuant thereto, cannot be doubted. When so appropriated it becomes part of the funds set aside for the proper functioning of the state government and its several departments, offices and purposes. The administration of the emergency fund prior to 1929 was committed to the discretion of the state board of control under specific provisions contained in the appropriation for that purpose. In 1929 that power was transferred to the department of finance (Stats. 1929, p. 96), and the executive officer of that department appears to be the sole state official to whom the legislature has delegated the power to administer the fund. There is nothing inconsistent with the budget plan in conferring such power upon this officer. In fact the power to apportion the fund, through the exercise of a sound discretion on his part, would seem to permit a flexibility in the handling of the state's funds not otherwise attainable and thus tend to assure a practical operation of the budget plan. It is in the exercise of his discretion that the petitioner is now attempting to transfer funds from the emergency appropriation to the funds of the several offices, departments and agencies enumerated in the petition pursuant to an allegation, admitted by the demurrer of the respondent, filed as a return to the alternative writ, that in the judgment of the director of finance an emergency has arisen in that no appropriation or an insufficient specific appropriation has been made for

the proper functioning of those state agencies by the legislature in 1933. It is not contended by the respondent that discretion has been improperly exercised by the petitioner, provided he has the power in each particular instance to exercise that discretion. ▆ It is conceded by the respondent that the determination of whether an emergency exists involves questions of fact. The ascertainment of those facts naturally devolves upon the department of finance. When the facts are ascertained the exercise of discretion thereunder will not be disturbed by the courts unless a lack of power to exercise the same or an abuse of discretion is made to appear. And it is apparently conceded that the state board of control, at least prior to 1927, had the power and discretion now sought to be exercised by the petitioner in the distribution of the emergency fund. But it is insisted that by reason of the definition of ''emergencies'' contained in the statute, the power has been denied the department of finance to allocate that fund or any part thereof to the support of the several departments of the state government for whose support a specific appropriation has been made in the budget enactment.

Prior to 1927 the statute did not define the term ''emergencies''. That term was first defined in the item of appropriation for emergency fund by the legislature of 1927 as follows: ''Emergencies within the meaning of this provision are hereby defined as contingencies for which no provision or insufficient provision has been made by the appropriations herein contained.'' During the succeeding biennial period the board of control administered the emergency fund in accordance with the definition thus laid down. In doing so the board very naturally first ascertained whether no provision had been made by the specific appropriations in the budget enactment or whether an appropriation had been made for the particular purpose and was insufficient. It then determined in the exercise of its discretion whether the transfer from the emergency fund was necessary to the proper functioning of the state government.

▆ The respondent's contention resolves itself to this: That the word ''contingencies'' cannot comprehend the usual, current, necessary expenses of a department or office, even though the specific appropriation made be obviously and entirely insufficient. The foregoing definition in the

1927 statute would not justify the limited application of the term thus sought to be placed upon it. On the contrary the definition in plain terms presupposes cases where no appropriation has been made for necessary state purposes or where an insufficient appropriation has been made in the budget enactment itself. The argument of the respondent is that the contingency must be an event which the legislature in the enactment of the budget bill did not have in mind and consider, and that all items of expense which were specifically considered must be excluded from consideration. As indicated the language of the definition of the term "contingencies" in the statute of 1927 definitely discloses that the legislature had in mind that some of the specific appropriations made would be insufficient for the purpose intended without any limitation which would exclude support and maintenance, and provided for such contingencies by placing the emergency fund at the disposal of the department of finance to be used in all proper cases.

Item No. 202 of the 1933 budget enactment, providing for a special emergency fund, confirms the conclusion that the use of the general emergency fund—item No. 201—for support was not excluded. In making the appropriation of this special emergency fund it was contemplated that commodity prices might increase during the two years next ensuing and that the specific appropriation for the "support" of the state prisons, state hospitals, and other state institutions might be insufficient. To provide against such a depletion of the general emergency fund during the ensuing biennial period as would jeopardize the proper support from that fund of such state institutions, in the event of a rise in commodity prices, this special emergency fund was in terms set apart for the "support" of those institutions, to meet such a contingency. The language of item 202 is a distinct recognition that emergency funds might be used for "support" if the specific appropriation should fail. Furthermore, the purposes of every appropriation act since the establishment of the emergency fund, as expressed in the title, has been "for the support of the government of the state of California".

We are not without definite judicial pronouncement in this state of the definition of the term "contingencies", to meet satisfactorily the case in hand. The meaning of that

term was involved in the case of *Verdier* v. *Roach,* 96 Cal. 467 [31 Pac. 554], wherein the court said at page 474: "There seems to be very little room for controversy as to the meaning of the adjective 'contingent' or the noun 'contingency'. Webster defines the noun as follows: '1. The quality of being contingent or casual; the possibility of coming to pass. 2. An event which may occur; a possibility; a casualty'. And defines the adjective 'contingent' as follows: '1. Possible, or liable, but not certain, to occur; incidental; casual. 2. Dependent on that which is undetermined or unknown. 3. (Law.) Dependent for effect on something that may or may not occur.' The law dictionaries and the Century Dictionary give substantially the same definitions. Among those given in the Century Dictionary are the following: 'Not existing or occurring through necessity. Dependent upon a foreseen possibility; provisionally liable to exist, happen, or take effect in the future.' Indeed, the word 'possibility' is defined (in law) to be 'a contingency'. (See Webster, Bouvier, Burrill, and Anderson.)'' When the word "contingencies" is given the authorized meaning of "events which are liable to occur", or events "provisionally liable to exist, happen, or take effect in the future", the term is appropriate to describe the events contemplated by the statute and by the action of the director of finance.

In 1929 the definition of emergencies was slightly changed. The word was then defined as follows: "Emergencies within the meaning of this provision are hereby defined as contingencies for which no appropriation or insufficient appropriation has been made by law." (Stats. 1929, p. 96.) This same definition was included in the 1931 statute (Stats. 1931, p. 318), and in the 1933 enactment. (Stats. 1933, p. 814.) The definitions laid down since 1927 did not have the effect of restricting the application of the emergency fund. If anything, they had the opposite effect, namely, to make the emergency fund available by proper order of the director of finance, to supplement not only the specific appropriation in the budget enactment, but also to supplement the appropriations *made by law* in addition to the specific appropriations of the budget statute. This enlargement of the definition would enable the department of finance to supplement the funds of a so-called self-

supporting department when its funds are depleted and the transfer from the emergency fund is found necessary, and thus make the law applicable to the situation presented in *Board of Fish and Game Commissioners* v. *Riley, supra.*

■ In support of the claim that each department of the state government must be held to the expenditure in each fiscal year of not more than one-half of the specific appropriation for the department in the budget enactment, it is argued that if the expenditure of more than one-half be permitted, a violation of section 677a of the Political Code, enacted in 1931, will take place. So far as pertinent that section provides: "Any officer or employee [of the state] who incurs any expenditure in excess of the fiscal year budget, as approved by the department of finance, shall be liable both personally and on his official bond for the amount of such expenditures."

There are at least two reasons why the foregoing provisions of said section 677a are not violated in the expenditure by any department of the state of the moneys transferred to its fund by order of the director of finance and in excess of the specific budget appropriation. In the first place, the budget enactment must be considered as a whole. When so considered we find a specific appropriation for each department, office and purpose, and likewise a specific appropriation for emergency fund to be distributed at the discretion of the department of finance not only for purposes not mentioned in the budget enactment but also for the relief of the several departments, offices and purposes specifically mentioned but whose appropriations have been found by the department of finance to be insufficient. When allocation has been made by proper order of the director of finance the specific budget allowance as thus supplemented is in law the valid appropriation for such department, office or purpose, the same to all intents and purposes as if the sum so transferred from the emergency fund had been included in the original and specific budget allowance. In other words, when the transfer is made the department or officer receiving the supplemental allowance is legally entitled to expend the original appropriation plus the additional amount assigned to it by order of the director of finance. Taken together the sum of the two amounts is the appropriation authorized by law.

■ In the second place every appropriation for emergency fund since 1919, including 1933, has contained the provision exempting such appropriation from section 4 of the act. Section 4 of each act covers the same subject matter but they are not in identical language. Generally they provide, and the 1933 act specifically provides, that not more than one-half of the appropriation made shall be expended during each fiscal year covered by the appropriation measure. Section 4 of the act of 1933 also provides: ''The appropriations under this act shall, unless otherwise provided, be subject to the provisions of section 677a of the Political Code . . . '' Since the appropriation for emergency fund in 1933 is in terms exempted from the provisions of said section 677a, it would necessarily follow that allocations from the emergency fund are not subject to the limitations of said section, and it would also follow that it was the intention of the legislature in exempting the use of the emergency fund from the provisions of said section that the use of the supplemental allowance by the department to which it is transferred should not be subject to said section; for it would be absurd to say that the supplemental allowance could be made but could not be used for the purpose intended.

■ We therefore conclude that the department of finance, through its executive officer, has the power to determine, in the exercise of a sound discretion, whether an emergency exists as contemplated by item 201 of the budget enactment, and as herein construed, and to order the transfer of money from the emergency fund for a necessary and proper state purpose when no specific appropriation has been made therefor, or when a specific appropriation has been made to a state department, office or purpose and the same has been found to be insufficient.

■ We come now to a consideration of the specific orders involved in this proceeding. As to demands (3), (4), (5) and (6) above enumerated, there can be no doubt that they fall within the classification of governmental purposes for which a supplemental allowance may be made on the record here presented. The emergency and necessity for the same are set forth in the orders of the director of finance. Whether the amounts therein specified are too large or too small does not now present a justiciable question.

The determination thereof is left to the sound discretion of the department of finance and, as stated, the respondent does not contend that, if the department has the power to make those allowances from the emergency fund, such discretion has been abused.

█ As to demand No. (1) a more difficult question is presented. Item No. 38 in the budget enactment of 1933 is as follows: "For support of department of finance, nine hundred nine thousand eight hundred six and 35/100 dollars; provided that no money hereby appropriated shall be used for the salary and expenses of chief of the division of service and supply or bureau of commerce, or bureau of publication of documents — $909,806.35." Considered alone this appropriation would evidence a specific intention that no money appropriated by the item be spent for salary or expenses of the chief of the division of service and supply; and on the theory upon which we have proceeded, i. e., that the appropriation specifically made is subject to augmentation by an allowance from the emergency fund in proper cases and that the sum of the two amounts is the amount finally and legally appropriated, it would seem that the specific appropriation above quoted had effectually cut off any expenditure of money appropriated by the budget measure for such salary and expenses. By this prohibition the following anomalous situation is disclosed: In 1927, when the department of finance was reorganized (Stats. 1927, p. 449), section 656 of the Political Code was enacted, which provides: "For the purpose of administration the department shall be forthwith organized by the director, with the approval of the governor, in such manner as shall be deemed necessary properly to segregate and conduct the work of the department. The work of the department is hereby divided into at least three divisions, to be known respectively as the division of budgets and accounts, the division of service and supply and the division of motor vehicles. . . . The chief of the division of service and supply shall be appointed by and hold office at the pleasure of the governor. . . . The director of finance may also be chief of the division of budgets and accounts without additional compensation." Under said section effective since 1931, the chief of each division receives such annual salary as may be fixed by the director of finance, with the approval of the

Governor. (Stats. 1931, p. 843.) By section 663 of the Political Code as enacted in 1927 and now in effect a board of control was created to consist of the director of finance, the chief of the division of service and supply of the department of finance, and the state controller, all acting *ex officio*. The director of finance is the chairman of the board and none of the members thereof may receive additional compensation for so acting *ex officio* as a board of control. By other sections of the same chapter in the Political Code the board of control is given extensive executive and administrative powers. The concurrence of two members is necessary in any decision or determination. In certain matters the board acts as a board of review over the action of the controller. The foregoing was the law when the legislature of 1933 inserted in item 38 of the budget bill the prohibition against any payment from the appropriations made thereunder for salary and expenses of the chief of division of service and supply. We are therefore confronted by a situation wherein a state officer is provided for by statute, his salary is fixed in the manner prescribed by law, his service is required in order that one of the most important departments of the state may function, yet the budget enactment purports to say that his salary and expenses shall not be paid from any appropriation made for the support of the department of which he is a constituent member. We are at a loss to know why this condition of the law was permitted to stand. It certainly was not designed, for it cannot be assumed that the legislature would intentionally create a situation where an officer of the state, whose duties are necessary to the operation of the state government, should receive no compensation. It may have been that bills were introduced in the last legislature looking to a reorganization of the department of finance and the abolishment of the office of chief of the division of service and supply and that such bills failed of passage. Be that as it may, we take the law as we find it, and in doing so we do not look alone to the form of the words used in the item of appropriation but to the whole statute and other statutes as well. (*Irelan* v. *Colgan,* 96 Cal. 413 [31 Pac. 294]; *Riley* v. *Johnson,* 219 Cal. 513 [27 Pac. (2d) 760].) We then find an office created and existing which is a necessary part of the functioning of the department of finance. We

further find an officer duly appointed to that office and acting as such, and with compensation for his services fixed as provided by law. He is a *de jure* officer and as such is entitled to compensation for his services as fixed by law. The question may be asked: From what fund is he to be paid? Item No. 38 answers the question so far as the general appropriation enactment is concerned. And the prohibition therein contained applies also to the emergency fund. Section 1029 of the Political Code provides: "Unless otherwise provided by law the salaries of officers must be paid out of the general fund in the state treasury, monthly, on the last day of each month." The time of payment was changed in 1933 by section 664a of the Political Code (Stats. 1933, p. 40), but section 1029 was not otherwise disturbed. We do not decide the question whether the salary of the chief of the division of service and supply should be paid from the general fund, as that question is not before us. We refer to section 1029 in passing as indicating that the legislature has provided for the payment of salaries from different funds, and item No. 38 has definitely excluded the payment of the salary of the chief of the division of service and supply from the budget appropriation and its emergency fund.

With reference to demand No. 2 the same general statutory situation is disclosed as obtains in connection with the chief of the division of service and supply. Sections 378 to 378g inclusive of the Political Code, providing for the establishment and operation of a bureau of commerce, were continued in effect notwithstanding the prohibition in item No. 38 of the appropriation measure of 1933. Nevertheless the prohibition must also be held to have effectively foreclosed the use of the emergency fund for the purposes of that bureau.

From the foregoing discussion it follows that the department of finance has exceeded its powers in making executive orders referred to in demands Nos. (1) and (2) above enumerated; that as to the executive orders referred to in demands Nos. (3), (4), (5) and (6) above enumerated, said department has properly exercised its power.

It is therefore ordered that the peremptory writ be denied as to demands Nos. (1) and (2) and that a peremptory writ of mandate be issued directing the respondent to

audit and approve demands covering items Nos. (3), (4), (5) and (6) above enumerated.

Thompson, J., Preston, J., and Seawell, J., concurred.

WASTE, C. J., Dissenting.—I concur in the majority opinion and in the judgment denying issuance of the writ as to items one (1) and two (2). I dissent from the opinion and judgment relating to items three (3), four (4), five (5) and six (6), and ordering issuance of the writ as to them.

Petitioner, as director of finance of the state, petitions for a writ of mandate requiring the respondent, as state controller, to approve certain claims, and, in order that they may be paid, to augment the specific appropriations made by the legislature for the support and maintenance of the departments and activities against which the claims are made by making transfer of money from the emergency fund created by the general appropriation act. The petition presents for our consideration the question: Does an "emergency" exist within the meaning of the appropriation act (Stats. 1933, chap. 278, p. 814) creating the "emergency fund", and which provides (Item 201) as follows: "For emergency fund, five hundred thousand dollars, $500,000.00 (exempt from section 4 of this act) to be expended only on written authorization of the State Department of Finance for emergencies. Emergencies within the meaning of this provision are hereby defined as contingencies for which no appropriation, or insufficient appropriation, has been made by law."?

The respondent, on the advice of the attorney-general, rejected the claims on the ground that no such emergency exists. The claims, six in number, are:

(1) In favor of the chief of the division of service and supply of the department of finance.

(2) For the support of the bureau of commerce of the same department.

(3) Support of the Governor's office—expense of conference of governors in California.

(4) Division of narcotic enforcement.

(5) Division of water resources, department of public works.

(6) Department of social welfare.

As to the first two, the petitioner, as director of finance, issued his executive orders, finding as to each that a "contingency has arisen . . . that *no appropriation* [italics supplied] has been made by law for the purpose during the fiscal year", and authorizing a sufficient expenditure from the emergency fund to cover the claims. As to these claims, I agree with the majority opinion that consideration is foreclosed by the provisions of the appropriation act (Item 38) providing for the support of the department of finance. That item reads: "For support of Department of Finance, nine hundred nine thousand eight hundred six and 35/100 dollars; *provided that no money hereby appropriated shall be used for salary and expenses of Chief of the Division of Service and Supply, or Bureau of Commerce, or Bureau of Publications and Documents——$909,806.35.*" [Italics supplied.] I find no other items in the appropriation act applicable to the chief of the division of service and supply or to the bureau of commerce.

The "executive orders" of petitioner applicable to the remaining four claims, and authorizing their payment out of the emergency fund, recite that "a contingency has arisen . . . in that *insufficient appropriation* [italics supplied] has been made by law for expenses, etc. . . . " These recitals imply, and the provisions of the appropriation act show, that the legislature, as required by the Constitution (art. IV, sec. 34), considered the budget bill submitted by the Governor, and finally enacted it as the appropriation act, making provision for the usual current expenses of the state for the biennial period, including the fiscal year in which accrued the claims here under consideration.

"Emergencies" which call for demands on the "emergency fund" are defined by the act (*supra*) "as contingencies for which no appropriation, or insufficient appropriation, has been made by law." We obtain no help from the decisions of other states in considering this provision. The financial set-up of our own state, under its Constitution and laws, affords a sufficient answer, in my opinion, to the efforts of petitioner to supply appropriations in two cases and to augment appropriations in the other cases. We have noted the express prohibition by the legislature against the use, for the first two claims, of any money appropriated.

I cannot agree that it was the intention of the legislature in enacting the loosely worded definition of an "emergency" to thereby permit an increase out of the "emergency fund" of appropriations made by it for the usual and ordinary expenses of the regularly constituted departments of state or state institutions. Neither am I persuaded that, because in the past transactions similar to those here under review have been permitted, they were legal. Our own decision in *Heron* v. *Riley*, 209 Cal. 507 [289 Pac. 160], does not apply here. We were there considering the statute (Stats. 1929, chap. 260) making the state liable for the negligent operation of its motor vehicles, and authorizing the state to insure against such liability. The statute was passed after the budget bill had been enacted. No appropriation for payment of the necessary insurance premiums was made in the appropriation act or by subsequent special statutes, yet it was made the duty of the proper authority to secure the proper insurance against liability. That was done, and we had no hesitancy, under the situation there disclosed, in holding that an "emergency" existed which permitted payment of the premiums out of the emergency fund.

The alternative writ of mandate heretofore issued should be discharged, and the petition for a peremptory writ should be denied *in toto.*

I am authorized to state that Mr. Associate Justice Curtis concurs in this dissenting opinion.

LANGDON, J., Dissenting.—I dissent. In addition to the reasons given by the chief justice in his concurring and dissenting opinion, I desire to point out that the effect of the majority opinion is practically to remove the word "contingencies" from the statute under consideration, and to make the emergency fund available in situations where the legislature did not intend it to be used. It is obvious that the words "emergencies" and "contingencies" are employed for a purpose, and while it may not be possible or necessary to lay down a definite, fixed meaning for these terms, it is nevertheless plain that they imply something that *was not foreseen* by the legislature at the time of making the regular appropriations. In other words, no matter how broadly they are construed, they cannot comprehend the usual, current operating expenses of a department of the government when the legislature has, with full knowledge of the func-

tions of said department, made a specific appropriation therefor. The words "insufficient appropriation" cannot be isolated from the rest of the statutory language, so as to justify resort to the emergency fund merely because the regular appropriation has been exhausted, for in such case the legislative appropriation would have little meaning, and the requirement of a budget might well be dispensed with. The "insufficient appropriation" which calls for a tapping of the emergency fund must be one where the insufficiency arises from a contingency. Hence, where a department pursuing its normal and proper functions exceeds its appropriation, it has disregarded the legislative mandate, and I do not believe that the legislature intended that the emergency fund should be used as a convenient method of evasion of the restrictions of the regular appropriation. Indeed, if the fund is to be so readily available for normal expenses, it will in all likelihood be found too depleted to take care of genuine emergencies.

I am perfectly willing to concede that the question is, in the first instance, one for petitioner as director of finance; and some weight is to be given to his conclusion regarding the existence of an emergency. But while his opinion is significant in the determination that an emergency *exists*, it cannot be conclusive as to what *constitutes* an emergency. In other words, his determination of the existence of an emergency must be tested by the proper meaning of the term as used in the statute, and under that test, it fails to justify the order demanded. The record contains nothing to show that the contemplated expenditures are for purposes that were not foreseen. The showing made is simply that the regular appropriation has been exhausted, and that petitioner has concluded that an emergency exists. To grant relief on such a record is to thwart the clear legislative intent.

The writ should be discharged and the proceedings dismissed.